## Jobe et ux. v. Brown et al.

(Decided Oct. 11, 1932.)

W. C. HAMILTON for appellants.

W. B. WHITE for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Isaac Jobe was the owner of a lot of ground on the east side of Richmond street in Mt. Sterling, on which were a storehouse and two cottages; the storehouse renting at $25 a month, and the cottages at $10 each a month. Against this property there was a street tax lien of about $140. C. M. Brown was the owner of lots Nos. 44 and 45 in Ashland Heights subdivision in the city of Ashland, on which there was located a residence which rented for about $15 a month. On this property there was a mortgage lien for $1,340 in favor of the Commercial Bank of Grayson, and a street tax lien of $450. In the month of December, 1930, Jobe and Brown exchanged these properties, Jobe assuming payment of the mortgage and the street tax on the property in Ashland, and receiving in addition to that property two notes from Brown for $1,250 each, dated January 1, 1931, and payable in one and two years from date with 6 per cent. interest. This suit was brought by Jobe and wife to cancel the transaction on the ground of mental incapacity growing out of physical weakness and intoxication, and misrepresentation as to the value and condition of the Ashland property and the amount of street taxes thereon. The chancellor refused to set aside the conveyances, but, it appearing that the street tax on the Ashland property exceeded the street tax on the Mt. Sterling property by $300, gave Jobe judgment for that amount. From that judgment the Jobes have appealed, and the Browns have prosecuted a cross-appeal.

The facts are these: Brown was an experienced real estate dealer and owned considerable property in ·Mt. Sterling, and some property in Ashland. Jobe is

a Syrian, and for a number of years had been engaged in peddling merchandise. More recently he had been buying and selling tobacco. He and Brown were friends, and had known each other for several years. He wished to dispose of the Mt. Sterling property. Brown approached him and proposed the trade. A trip to Ashland was arranged. In the car were Brown, Roy Jackson, a real estate agent who was looking after the matter for Brown, Jobe, and his 18 year old son, George Jobe. While en route to Ashland, a pint of liquor was procured by some member of the party, as to whose identity there is a dispute. There was also evidence that Jobe had spells, and had also undergone an operation, from all of which he was physically and mentally weak. Jobe claims that after taking the whisky he became intoxicated, and sized up the situation in the following language: "I feel pretty brazen." After reaching Ashland they went out to the Brown property and spent some time in its inspection. Jobe and his son say that his son stated that the property was in bad condition, and advised against the trade. Jobe further claims that he could not see very well, and there is evidence of a physician that his eyesight was impaired to the extent of 25 per cent. On leaving the premises they met a man by the name of Fannin, who was engaged in the real estate, oil, and gas business, and who proposed to lease the property for gas and agreed to send down a lease to be signed either by Jobe or Brown, whichever owned the property. Afterwards the lease was mailed to Jobe, but, after the purchase of the property, Fannin declined to lease on the ground that his company did not intend to do any more drilling that year. Three or four days after their return to Mt. Sterling, a written contract of exchange was drawn up and signed by Brown and wife and Jobe and wife. Later on Jobe had his attorney prepare a deed conveying the Mt. Sterling property. This deed was signed and acknowledged by Jobe and wife before a notary public. Neither Brown nor Jackson, nor any one else representing Brown, was present. In the meantime Brown prepared his deed conveying his property. The parties then proceeded to Grayson to close the transaction. While going to Grayson some more liquor was produced, of which Jobe partook. Jobe claims that he was somewhat intoxicated on that occasion, and was unable to find his way out of the room, but Mr. Strother of the Commercial Bank, and others who were present;

say that they detected no sign of intoxication, and that there were four doors to the room, and that Jobe merely started for the wrong door. While there, he paid the bank some interest on the mortgage lien, and the deeds were delivered. Jobe claims that he proposed to get a lawyer to examine the tax liens on the Ashland property, but Brown said there was no use in doing that. Brown's evidence is to the effect that he told Jobe merely that there was no use in having the title examined as it had already been examined by the bank. Jobe testified that Brown said that the street taxes on the Ashland property were about the same as those on the Mt. Sterling property. After the transaction was closed, Jobe went to Ashland and ascertained that the street taxes were $440 instead of $140, the amount of street taxes on the Mt. Sterling property. He then became dissatisfied with the trade and proposed to rescind the transaction on certain terms. Jobe also says that both Brown and Jackson in proposing the trade stated that the Ashland property had sold for $3,700 or $4,700, he forgot which. He did not know that Charlie Brown ever said anything about the property being worth $7,500, but Roy Jackson said that the property had sold for $7,000 or $7,500, he did not know which. Jackson also said that there were several gas wells in the vicinity, and that sometimes a gas well paid from $500 to $800 a year. Drs. Morton Faulkner, and D. H. Bush gave it as their opinion that Jobe was not capable of transacting business and dealing at arm's length with an active business man. On the other hand, Dr. J. F. Reynolds, whose deposition was taken by Jobe, testified that Jobe's vision was 75 per cent. normal, and that his mental condition was also normal. There was further evidence that Jobe and his wife were uneducated and could barely write their own names in English.

On the other hand, Brown and Jackson both say that Jobe was never intoxicated at any time during the transaction. On the contrary he was an experienced business man and a good trader, and fully capable of taking care of himself in any trade. They furthermore say that neither of them made any representations as to the value of the Ashland property. They admit referring to the fact that there were gas wells in the vicinity of the property, and introduced evidence showing that this was true. Brown admits

that he told Jobe that he thought the street taxes on the two pieces of property would be about the same. However, he and Jackson claim that Jobe finally agreed to the trade, regardless of the amount of street taxes, saying that, if there was any difference, it could be made up by one taking a meal on the other.

The witnesses testifying for appellants fixed the value of the Mt. Sterling property at from $3,000 to $4,500, while Brown's witnesses fixed the value at from $2,500 to $3,000. Appellants' witnesses fixed the value of the Ashland property at from $1,500 to $2,000, while the witnesses for appellees fixed its value at from $1,800 to $3,000.

It is very difficult in times of great depression such as existed when the exchange of the properties took place to fix with reasonable certainty the value of real estate in the absence of an actual sale. Here the witnesses differ widely as to the values of the respective tracts. It may be that, viewed in the light of prices then obtaining, Jobe made a bad bargain, but, considered in the light of the fact that Ashland real estate was more likely to advance in price than that located in Mt. Sterling, it is by no means clear that such was the case. But, even if it be conceded that Brown got the better of the bargain, this will not authorize a rescission of the transaction, unless Jobe was incapable of contracting, or was the victim of fraud or imposition.

The point is made that a relation of trust and confidence existed between Jobe and Brown, imposing on the latter the burden of showing the fairness of the transaction. Jobe did not live with Brown, and Brown had not been attending to his affairs, or acting as his agent, representative, or confidential adviser in any capacity whatsoever. All that can be said is that they had known each other for a number of years, and their relations had been cordial and friendly. More than this is required to constitute a confidential relation within the purview of the rule.

The argument that Jobe was incapable of contracting because of mental incapacity resulting from ignorance, intoxication, and physical weakness is not persuasive. It may be that he could read and write English only with great difficulty, but, as it is not claimed that the written contract did not conform to

the true agreement, or that its contents were misrepresented, it is not perceived how Jobe's inability to read and write played any part in the case. While it is true that two physicians expressed the opinion that he was not capable of dealing at arm's length with an adversary, another physician introduced by appellant stated that his mental condition was normal. Aside from this Jobe had been a merchandise peddler for many years, and it may be doubted if there is any occupation better fitted to equip a man to contend with his fellow·man and look after his own interest. Moreover, Jobe's depositions, which we have carefully read, evince a shrewdness and understanding wholly at variance with the theory of mental incapacity. But it is said that he was the victim of intoxication, and that this gave him a distorted view of the Ashland property. If he had been intoxicated to such an extent as to render him incapable of knowing what he was doing, or of comprehending the consequences of his acts, and he then had examined the property and executed the contract, a different question would be presented. But that is not the case. We are not persuaded that he was intoxicated to any appreciable extent at the time he examined the property. The inspection took place some hours after the liquor was drunk, and occupied a considerable period of time. He remembers too much of what occurred to justify the inference that he did not know what he was doing. Not only so, but the contract was not executed at that time. On the contrary, it was executed some three or four days later. Even if the liquor which he drank that morning operated on him in such a way as to give him a rosy view of the premises, there was plenty of time for the picture to fade from his memory and for him to come back to earth again before the contract was executed. Though intoxicating liquor is responsible for many of the misfortunes and sorrows that come to humanity, we hardly think that Jobe's bargain may be laid at its door. Doubtless it is true that both Brown and Jackson spoke of the presence of gas wells in the vicinity of the Ashland property, but the uncontradicted evidence shows that such is the fact. While Jobe claims that Jackson made extravagant statements as to what the property had been sold for, this is denied by Jackson and Brown, and it is clear that Jobe examined the property and relied on his own judgment and not on any of the statements

attributed by him to Brown and Jackson. Jobe further claims that his eyesight was bad and that he could not see the defects in the house. A physician stated that his vision was 75 per cent. normal, and we hardly think that there was anything. about the premises that he failed to see. But, aside from all this, he admits that his son called his attention to certain defects in the premises and advised against the trade. Whether advised by his own eyesight, or by his son, he is not now in a position to rescind on account of conditions of which he was fully informed. The chancellor, who knew and heard the parties testify, was of the opinion that Jobe was fully capable of contracting, and that he was not a victim of fraud or imposition. With this conclusion we agree.

On the cross-appeal, it is insisted that, having refused a rescission, it was error to award Jobe judgment for $300. Brown admits that he told Jobe that he thought that the street taxes on the Ashland property were about the same as the street taxes on the Mt. Sterling property. There can be no doubt that the trade was made on that basis. Afterward it developed that the street tax on the Ashland property was $300 more than that on the Mt. Sterling property. As this item constituted but a small part of the trade, we think the chancellor had the right to deal with the matter on equitable principles, and that substantial justice was done by ordering the repayment of the $300 rather than a rescission of the entire transaction.

Judgment affirmed on both the original and cross appeals.